## WALLACE *v.* WILDER and others.

*(Circuit Court, D. Massachusetts. October 23, 1882.)*

1. ARBITRATION BOND—LIABILITY OF SURETY.

Upon a consideration of the facts of this case, and an examination of a bond given by defendants in an arbitration proceeding, it appeared that the questions considered and passed upon by the arbitrators were properly before them, and it was *held* that the fact that the surety did not understand the real purport of the bond, or that he may have been misled by the belief of the principal as to certain things, did not relieve him from liability on account of the refusal of the principal to abide by the award, and that judgment must be rendered in favor of plaintiff for the penal sum of the bond, with interest thereon from the date of the breach thereof. Pub. St. Mass. *c.* 171, § 9.

2. SAME—FRAUDULENT REPRESENTATIONS OF PRINCIPAL.

Even when fraudulent representations are made by a principal, the surety cannot be permitted to show them as a defense against the obligee of a bond in a suit for the breach thereof.

*S. N. Aldrich* and *Ball, Storey & Tower,* for plaintiff.

*T. L. Wakefield,* for defendants.

COLT, D. J. This is a suit upon a bond. The parties having waived a jury trial, the case was heard by the court. To a proper understanding of the case it is necessary to state the facts in some detail:

In 1871 the firm of Wallace & Co., composed of David Wallace, James Wallace, John Wallace, George G. Wilder, and George W. Bancker, was formed, for the purpose of carrying on the dry goods business in the city of New Orleans. By the articles of copartnership David Wallace was to furnish as capital the sum of $250,000, and James Wallace the sum of $75,000. David Wallace was to have 50 per cent. of the profits, James Wallace 15 per cent., John Wallace 10 per cent., George G. Wilder 15 per cent., and George W. Bancker 10 per cent., but David and James Wallace and Wilder were not to draw more than $10,000 a year, and John Wallace and Bancker not more than $7,500 a year, from the profits. Should the partners at any time disagree, either during the partnership or its liquidation, they were to submit their differences to amicable compounders, whose decision should be final.

The firm continued until November, 1875, when it became insolvent. On December 6, 1875, the other partners conveyed all the property of the firm to David Wallace as liquidator, to effect a settlement, if possible, with the creditors by compromise or otherwise, Wallace agreeing to settle with the partners "for their interest in any amount of profit arising from a compromise of the liabilities of the firm;" the settlement to be "made monthly, commencing on or before one year from the date of compromise." Wallace was to account to the partners "for any profit made by this settlement, according to the respective interests of each partner, as stipulated in their several acts of copartnership." Any disagreement that might arise in the settlement was to be decided by arbitration. Each partner was allowed to draw $500 per month from the first day of December, 1875, during the time of their services in the liquidation. Another paper signed the same day provided for the settlement of confidential debts and borrowed money. By an agreement dated December 7, 1875, between David Wallace and Bancker, the former agreed that Bancker, in addition to the rights guarantied to him in the transfer of December 6th, should not be liable for the amount of the debit of his account to the extent of $7,500 per annum from January 1, 1871; and the sum of $500 per month, during his term of service, was guarantied to him for one year from January 1, 1876.

On March 7, 1876, a composition was brought about with the creditors under the bankrupt act, and a final decree entered in the United States district court of Louisiana. This settlement was effected by the payment of 33⅓ per cent. of the indebtedness.

On March 23, 1876, a more formal transfer of the firm property to David Wallace, as liquidator, was made by the other partners. This agreement provided that David Wallace should " hold the surplus funds, if any, realized out of said assets, for account of the partnership, subject to the rights of the respective partners, according to the provisions of the several copartnership papers, and the several agreements of the sixth of December, 1875, and other dates."

On April 26, 1877, Bancker and Wilder filed a petition in the fifth district court for the parish of Orleans against David Wallace, for a proper distribution of the partnership assets in his hands. James Wallace and John Wallace were joined as parties defendant. The petition sets out the partnership, the share of Bancker and Wilder in the profits, and the embarrassment of the firm in the latter part of 1875. It refers to and makes part of the petition the agreements entered into by the parties, by which the firm property was placed under the control of David Wallace as liquidator. It recites the composition effected with the creditors, and then states the amount required to pay such composition, and the amount of firm property and assets realized, claiming there is a large balance in the hands of David Wallace, which he neglects and refuses to account for. It charges various irregularities on the part of David Wallace in the administration of the assets in his hands, and alleges, among other things, that he seeks to charge against the partnership of Wallace & Co. obligations contracted in violation of the articles of partnership; that in order to increase his apparent capital in the firm of Wallace & Co., he seeks to charge $20,000 of stock of little or no value, illegally claiming this amount must be allowed before any share of profits is paid to the petitioners. It further alleges that over $10,000 are now due and owing to each of petitioners from David Wallace, upon a proper accounting and settlement, and that such accounting and settlement are necessary. The petioners pray for an injunction, and that a receiver may be appointed and put into possession of all the assets, property, books, and papers of the firm, to liquidate said firm, in accordance with law and the agreements of parties, under the orders of court; that a proper accounting and settlement may be had of the partnership of Wallace & Co.; that such sums may be paid the petitioners as are lawfully due them; and that the other partners may also be paid their just shares.

On June 30, 1877, before any answer was filed, an agreement was entered into between the partners to take the case out of court and submit all their differences to arbitration. This agreement recites that, whereas, the parties " are now engaged in a litigation in the fifth district court of this city, with reference to the settlement of the partnership that formerly existed between them under the style of Wallace & Co.; and, whereas, all parties, in advance of the decision of the court on the questions now submitted to it, are desirous of submitting all their differences to arbitrators and amicable compounders," therefore, " they mutually agree to submit all their differences, and all questions arising out of the settlement of the partnership of Wallace & Co., and all disputes which may arise between the parties in the course of the arbitration with reference to said partnership affairs, to arbitrators, who shall have the power of amicable compounders." After some provisions as to the arbitrators,

it then states that "Bancker and Wilder on the one part, and the Wallaces on the other, are to enter into a penal and security bond to each other, with good and solvent security, to be accepted by the parties, in the sum of $15,000, to be condititioned as follows, to-wit: that they will abide by the award as made by the amicable compounders, and will pay the sums adjudged against them within 60 days from the date of the award, the bankruptcy of the parties not excepted, otherwise they and their sureties to be liable for the amount of the award, and the amount of the penalty fixed in the bond."

This clause is so far modified in a later part of the agreement that Bancker and the Wallaces are to give bonds to each other in the sum of $10,000, and Wilder and the Wallaces in the sum of $5,000. All parties signed this agreement in person but Wilder; Bancker, as agent, signed for him.

The arbitrators appointed in pursuance of the submission proceeded to act. At their second meeting in January, 1878, Bancker and Wilder filed a protest against their exceeding their jurisdiction, contending that the question submitted is what distribution shall be made between the respective partners of the surplus remaining after payment of the composition in bankruptcy; that the discharge operated in favor of each partner, as well against his several copartners as against third parties, therefore there could be no claim existing in favor of one partner as against another. They further claimed that under the agreement of December 6, 1875, David Wallace was to distribute the surplus ratably among all the partners, as distributions were made under the articles of copartnership; that the surplus is in law profits, and is so regarded by the letter of said agreement, which reads: "And shall settle with them (his copartners) for their interest in any amount of profit arising from a compromise of the liabilities of the firm;" that this view is confirmed by the succeeding clause, which provides "that David Wallace shall make monthly settlements with his copartners," and is further confirmed by the fact that this arbitration has been substituted for the suit in the fifth district court, which had for its object a distribution of the surplus in the hands of David Wallace.

In May, 1878, the arbitrators awarded judgment against Wilder and in favor of David Wallace for $13,059.15. In their award they state that "there is no reason in law or in practice, so far as shown, that the separate interests of this copartnership should be settled in any other way than by the laws which govern all ordinary business copartnerships, and no law which changes the relations between the parties as to the surplus remaining after the composition debts are paid." They therefore find "that the surplus must be divided among the partners with reference to the individual accounts of each partner with the partnership, and with his copartners, and that the capital must be replaced to the partners who put in capital before there can be any division of profits." They further find that Bancker and Wilder put in no part of the capital; that the assets, after the composition, would not be sufficient to replace the capital of the Wallaces, allowing for all over-drafts; that, therefore, in no event could there be any surplus of profits coming to Bancker or Wilder. They further find Wilder indebted for over-drafts and money received by him during the existence of the firm, and since it went into liquidation, over and above the amount he was allowed to draw of $13,-

959.15. Bancker, by reason of certain agreements personal to him, was discharged from any liability.

The award was afterwards made executory in the fifth district court for the parish of Orleans, and upon appeal to the supreme of the state judgment was affirmed, and a motion for a rehearing denied. George G. Wilder having failed to pay the award, this suit is now brought by David Wallace against him and Herbert A. Wilder upon the bond for $5,000, given in conformity with the agreement to arbitrate. Both are principals in the bond, though, in fact, Herbert A. Wilder signed as surety. George G. Wilder having died since the suit was commenced, it is continued against the surviving defendant. Pub. St. Mass. *c.* 165, § 12.

The main controversy in this case turns upon the proper construction of the condition in the bond, which is as follows:

"Whereas, George W. Bancker and George G. Wilder have agreed with said David Wallace to submit to arbitration certain matters in difference between them and said Wallace, appertaining to the distribution among the partners of the late firm of Wallace & Co., of New Orleans, of the assets of said firm now in the hands of said David Wallace, hereby ratifying the action of said Bancker in the matter of said agreement to arbitrate: Now, if the said George G. Wilder shall abide the decision of the arbitrators, and pay to said David Wallace such amount as shall be awarded to be paid to him, within 60 days from the date of the award, then this obligation shall be void, otherwise it shall be and remain in full force and virtue."

The language and meaning of this instrument, in the light of what had transpired between the parties, seem clear and unmistakable. Differences had arisen, as we have seen, in relation to the distribution of the assets in the hands of David Wallace; these differences Bancker and Wilder had agreed to submit to arbitration, and Bancker's action in signing the submission for Wilder is ratified.

The defendants contend, however, that the agreement to arbitrate is broader than the bond; that it embraces all differences between the parties, while the bond only covers such differences as appertain to the distribution of the assets; and that while the bond may include all questions relating to such distribution, it covers nothing more.

We agree with the defendants that strictly the bond only includes differences appertaining to the distribution of the assets in the hands of David Wallace, and that all questions in the submission not appertaining to such distribution would not come within the letter of the bond. But the defendants wish us in effect to go beyond this, and hold that these words mean a distribution according to their understanding of the agreement of December 6, 1875; that is, a distribution of the assets as profits, subject only to an accounting during the time of liquidation. But this is assuming that the bond means

that the main difference between the parties on the subject of distribution should be decided in the defendants' favor; for David Wallace took quite a different view of the agreement of December 6th. He claimed that before there could be any profits to divide, a general accounting should be had between the partners prior as well as subsequent to the time of liquidation, and that he should be allowed in such accounting for the capital he put into the firm; and this was the view taken by the arbitrators. To say that we must assume the defendants' construction of the agreement of December 6th to be correct, and that the only differences submitted were such as might follow upon such an assumption, is manifestly wrong. Why should one construction of the agreement be adopted rather than the other? If the defendants so understood the agreement, the bond should have been so worded as only to cover the differences that might arise upon such a construction.

Questions appertaining to the distribution of the assets being within the scope of the bond upon the narrowest construction, we must hold that the proper interpretation of the agreement of December 6th, and the question of accounting growing out of it, were within the bond. It follows as a consequence that, so far as the award only embraced such questions, the bond would be good, though the submission may have been broad enough, owing to the general terms used, to have comprehended other differences.

An examination of the record, however, discloses that all the real differences between the parties, so far as we know, related directly to the distribution of the assets, and that however comprehensive the submission may have been by reason of the use of general terms, it was only intended to be acted upon and was only in fact acted upon in respect to matters relating to such distribution, and such matters were alone considered in making up the award. In other words, the cause and source of all the differences between the parties grew out of the subject of distribution. Is there any matter of controversy over the meaning of the agreement of December 6th, or contained in the suit brought by Bancker and Wilder, or mentioned in the submission, or referred to in the protest or the award, which does not clearly appertain to the manner in which the surplus assets shall be distributed?

Bancker and Wilder claimed that according to law, and the agreement of December 6th, the surplus was to be distributed as profits, and that no accounting could be had prior to the time of liquidation.

Wallace claimed that according to law, and the agreement of December 6th, before there could be any profits to divide there must be

an accounting during the time of the partnership as well, and that he should be allowed for the capital he furnished. Surely these, the main questions in dispute, were most significantly connected with the distribution of the assets.

The suit brought by Bancker and Wilder is termed by them in their protest before the arbitrators a suit for the distribution of the assets, and an examination shows that the matters therein alleged related directly to this.

The agreement to arbitrate distinctly says that it is to be substituted for this suit.

In their protest before the arbitrators the defendants are far from showing that questions foreign to the distribution of the assets were under consideration. They simply claim certain things as law, and a certain construction and understanding on their part of the agreement of December 6th. If the arbitrators had held their law or their construction of the agreement to be sound, undoubtedly the questions to be passed upon would have been narrowed; but these very questions involved the main issues between the parties on the subject of distribution.

We find the award turned upon the issues thus raised, being the questions of partnership accounting and allowance of capital,—subjects vitally connected with such distribution.

It is unimportant, therefore, that the submission may have employed terms broad enough to cover other differences, if, from the beginning to the end, the whole controversy centered about and turned upon questions which related to the manner of distribution. The fact is, the real point in dispute was not between matters which related and matters which did not relate to the distribution of the assets; but at what period of time should the accounting, in such distribution, according to law and the agreements of parties, begin? No distribution could well take place without an accounting of some character; but should such accounting cover only the period of liquidation, or the partnership as well? Now that the accounting during the time of liquidation should appertain to the distribution of the assets, and be covered by the bond, as the defendants admit, but the accounting prior to such liquidation and during the partnership should not appertain to such distribution, and not be included in the bond, can hardly be true. Of course, the defendants here fall back upon what they say they understood the agreement of December 6th to mean, and what they believed the law to be as to any partnership accounting after a discharge in bankruptcy. But this is no answer,

because what the agreement of December 6th meant and what was the law were the very questions which met the arbitrators on the threshold of their investigation.

We are not deciding the merits of the original controversy. Our inquiry is directed to ascertaining the subject-matter covered by the bond, and we are of the opinion that the bond embraces all questions acted upon in the submission and governing the award. But, looking for a moment at the agreement of December 6th, we can hardly agree with the construction put upon it by Bancker and Wilder. Whatever may have been their understanding of it at the time, or the spirit of it, as Bancker terms it, its express provisions nowhere state that Wallace is to hold the surplus as profits, subject to no accounting back of the time of liquidation. Nor is this by any means to be reasonably inferred from what is said. Wallace agrees to account *for such interest* as the other partners may have in the profits, which is essentially different.

Again, if the understanding of this agreement was that the surplus should be distributed as profits, subject to no partnership accounting of any kind back of the time of liquidation, why should Bancker on the following day obtain an additional agreement from Wallace not to debit his account with the $7,500 a year he drew during the continuance of the firm? Why should he obtain verbal and written agreements which fully protected him upon any such back accounting?

In the further paper of March 23, 1876, which was a more formal transfer of the firm assets to David Wallace as liquidator, why did not Bancker and Wilder make their understanding of the agreement of December 6th clear? In the suit brought by them in April, 1877, against David Wallace, they allege that he wrongfully seeks to have allowed $20,000 of worthless stock as capital, thus raising the question themselves of an allowance of capital, and so of an accounting prior to liquidation. Nor do they specifically deny that the good capital furnished should not be replaced, or that the accounting should not go back of insolvency. On the contrary, while the object of the bill is for a distribution of the assets in the hands of Wallace, it calls at the same time for the usual accounting had upon a dissolution of a partnership.

If Wilder understood that the agreement to arbitrate and the bond were only to cover an accounting since the liquidation, why did he not, on arriving at New Orleans, and discovering, as he claims for the first time, the breadth of the submission, repudiate Bancker's

authority to sign for him a submission of such a character, instead of ratifying it by his acts and by the language of the protest?

It seems to us that the explanation of George G. Wilder's conduct lies in his confidence that legally there could be no accounting between the partners prior to bankruptcy, and that when he found the arbitrators took a different view, on his arriving at New Orleans, by calling for the firm books, he fell back on the agreement of December 6th, which he also thought protected him. But with all that preceded the submission it would seem as if he must have known that David Wallace took different views upon these questions from his own; at least, sufficient had happened to put him upon his guard in signing any submission or bond in connection therewith. If he took the risk and gave a bond covering differences appertaining to the distribution of the assets, neither he nor his surety can complain because he was mistaken, in the opinion of the arbitrators, as to the law and the construction of the agreement of December 6th.

Holding as we do that the bond covers the questions acted upon in the submission and governing the award, there is no force in the point, so far as this action is concerned, that Wilder did not authorize Bancker to sign so broad a submission, because Bancker's action in matters covered by the bond is ratified in the recital. Again, the acts of Wilder in attending all the meetings of the arbitrators but one without denying Bancker's authority, and the language of the protest signed by him, in which he speaks of the submission as signed "by all parties in interest," place the question of ratification beyond any reasonable doubt. Nor can the fact that the surety Herbert A. Wilder did not understand the real purport of the bond, or that he may have been misled by the belief of George G. Wilder as to certain things, relieve him from liability. *Western N. Y. Life Ins. Co.* v. *Clinton*, 66 N. Y. 326; *Ladd* v. *Board of Trustees*, 80 Ill. 233. Even where fraudulent representations are made by the principal, it has been held the surety cannot be permitted to show them as a defense against the obligee. *George* v. *Tate*, 102 U. S. 564; *Dair* v. *U. S.* 16 Wall. 1. Nor, if the bond in suit is sufficiently broad to make him liable, can the fact that Herbert A. Wilder refused to sign the first bond that was drawn make any difference. This earlier paper was certainly very general and somewhat indefinite in its terms, but even this received the signature of George G. Wilder. Nor can the fact that the corresponding bond, given by Wallace to protect Wilder, was not actually signed by him, affect this case. Wallace gave a similar bond, with surety, which, so far as appears, was satisfactory and acceptable to

Wilder. Even if the submission calls for a bond signed in person by Wallace, which he disputes, after a bond had been given which was apparently satisfactory, and the arbitrators had gone on and acted and made an award, it is too late for Wilder now to attack the validity of his own bond on this ground.

There is still less merit in the technical objection raised by the defendants that the award was in favor of David Wallace, liquidator, while the bond was to pay David Wallace. The whole arbitration proceeds upon the theory of an accounting between Wallace and the other partners, and the award is clearly the sum due from Wilder to Wallace personally; therefore the fact that he is termed liquidator must be considered, as urged by the plaintiff, merely a manner of designation or description,—not as meaning a distinct capacity in which the fund should be held.

Verdict should be given in favor of the plaintiff for the penal sum of the bond, with interest thereon from the date of the breach, July 2, 1878, and judgment so entered. Pub. St. Mass. *c.* 171, § 9; *Leighton* v. *Brown*, 98 Mass. 515; *Bank of Brighton* v. *Smith*, 12 Allen, 243; *Ives* v. *Merchants' Bank*, 12 How. 159, 165.